**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **JEREMY PAUL THORNBURG,** | § | |
| **TDCJ No. 01957650,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:17-cv-00103-O-BP** |
| | § | |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is a Petition for Writ of Habeas Corpus ("the Petition") filed by Petitioner Jeremy Paul Thornburg pursuant to 28 U.S.C. § 2254. ECF No. 3. United States District Judge Reed C. O'Connor transferred this case to the Wichita Falls Division on July 27, 2017. ECF No. 5. On July 28, 2017, Judge O'Connor referred the case to the undersigned per Special Order No. 3. After considering the pleadings and applicable law, the undersigned **RECOMMENDS** that Judge O'Connor **DENY** the Petition for Writ of Habeas Corpus (ECF No. 3).

**PROCEDURAL BACKGROUND**

Petitioner Jeremy Paul Thornburg ("Thornburg") is a prisoner confined in the Ferguson Unit of the Texas Department of Criminal Justice, Correctional Institutions Division ("TCDJ-CID"), in Midway, Texas. ECF No. 3 at 1. He is serving a life sentence. *Id.* at 2. Because Thornburg is incarcerated within the Texas Department of Criminal Justice, a proper respondent in this case is Lorie Davis, the Director of the Texas Department of Criminal Justice, Correctional Institutions Division (the "Director"). *See Joe v. Fitzsimmons*, No. 3:16-CV-0275-L-BH, 2016 WL 1594348,

at *1 (N.D. Tex. Mar. 17, 2016), *report and recommendation adopted*, No. 3:16-CV-275-L, 2016 WL 1588150 (N.D. Tex. Apr. 20, 2016) (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004)).

Thornburg was indicted for murder on March 25, 2013. ECF No. 18 at 3. He was convicted and sentenced to life imprisonment by a jury on October 21, 2014. *Id.* He appealed his conviction to the Second Court of Appeals, Fort Worth, Texas ("COA"), which affirmed. ECF No. 1 at 3; *Thornburg v. State*, No. 02-14-00453-CR, 2015 WL 4694094, at *2 (Tex. App.—Fort Worth Aug. 6, 2015, pet. ref'd). The Texas Court of Criminal Appeals ("TCCA") refused his petition for discretionary review ("PDR") on November 4, 2015. ECF No. 20-1.

Thornburg then brought a state writ of habeas corpus before the TCCA on July 15, 2016. ECF Nos. 1 at 3–4; 18 at 3. On September 21, 2016, the TCCA remanded the case to the trial court for further findings of fact. ECF No. 20-63; *Ex parte Thornburg*, WR-85,650-01, 2016 WL 5118443, at *1 (Tex. Crim. App. Sept. 21, 2016). The trial court made findings on March 6, 2017. ECF No. 20-60 at 275. The TCCA subsequently denied the writ without written order on the findings of the trial court, on April 26, 2017. ECF No. 20-55.

Thornburg filed the Petition in this Court on July 3, 2017. ECF No. 3. Pursuant to this Court's Order (ECF No. 9), the Director filed a preliminary response on February 15, 2018. ECF No. 18. Thornburg filed a reply on February 28, 2018. ECF No. 23. The parties agree that the Petition is neither barred by the statute of limitations nor is it successive. ECF No. 3 at 11; No. 18 at 12.

## FACTUAL BACKGROUND

The COA adopted Thornburg's statement of the facts. *Thornburg*, No. 02-14-00453-CR, 2015 WL 4694094, at *1 n.2. Those facts are as follows:

## A. Overview

On the morning of December 11, 2011, Johnny Salinas discovered that his grown granddaughter, Candice Shields [hereinafter, "Shields"], was missing from her bedroom when he went to wake her for work. At first, he assumed that she had left in the night to "party," but her phone was still on her bed; her purse and make up were still in the bedroom as well. As the morning wore on and Shields did not show up, Salinas grew increasingly worried. Eventually, Salinas hit redial on Shields's phone, and the call went to Shields's best friend, Missy Munn. Salinas explained his concerns to Munn, and she came to his house.

Later that morning, Shields's ex-boyfriend, Billy Wilson, joined Munn at Salinas's home, and because he had never seen Shields leave the house without her purse, cell phone, and make up—all of which were still in her bedroom—he called the Graham police. The police interviewed the family, and based on their conversations with the family, with Wilson, and with Munn, the police began treating Shields's disappearance as a missing-person case. Thereafter, in the ensuing weeks and months that followed, despite a massive search by law–enforcement officials and civilian volunteers—which included helicopters, fourwheelers, and cadaver dogs and which covered untold miles of search area—Shields was never found.

## B. Testimony Concerning Shields's Background

Shields grew up in Graham and was convicted of a sex crime as a juvenile; as a result, she was required to register as a sex offender. At age seventeen, Shields left her parents' home and moved in with Wilson and his family in Jermyn, Texas,

and eventually had a child with Wilson. In the latter part of May 2011, Shields left Wilson and moved to Abilene to live with a man named Allen Faircloth. When Shields's relationship with Faircloth soured in the summer of 2011, she called Wilson to give her a ride back to Graham, and she moved in with Munn.

In October 2011, Shields moved in with her friends James and Misty Barnett. On the same day that Shields moved in, James Barnett's half-brother, Thornburg, also moved into the Barnetts' home. Within a short time after Shields met Thornburg, they began a romantic relationship, and within a couple of weeks, they announced that Shields was pregnant with Thornburg's baby. Misty grew scared of Thornburg, and he and Shields were asked to move out of the Barnetts' home.

Because the couple had nowhere to go and because Thornburg was unemployed, he moved back into his mother and stepfather's home in Sweetwater; Shields moved into her grandparents' home in Graham and disappeared approximately ten days later.

Shields used to call her mother daily, but her mother had not heard from Shields since her disappearance.

### C. Testimony by Law–Enforcement Officials

### 1. Lieutenant Jim Reeves

Lieutenant Jim Reeves of the Graham Police Department headed up the investigation into Shields's disappearance. Initially, he gathered information from her friends and family members, as well as contacts from Shields's cell phone. The data recovered from Shields's cell phone revealed that up until the day of her

disappearance, Shields had almost daily communications with Wilson, Faircloth, Thornburg, and possibly other men.

Lieutenant Reeves testified that he called Texas Ranger Cory Lain to help with the investigation of Shields's disappearance and that they began a series of interviews to determine if anyone had ideas on where Shields might have gone. Lieutenant Reeves testified that Faircloth and Wilson had verified alibis for the night of Shields's disappearance.

When Lieutenant Reeves interviewed Thornburg by phone on December 15, 2011, Thornburg claimed that he had been in Sweetwater on the night that Shields had disappeared and that he did not have gas money to drive to Graham on that night. Two weeks later, on December 29, 2011, Lieutenant Reeves and Ranger Lain drove to Sweetwater to interview Thornburg in person at the Sweetwater police station. Thornburg maintained that he did not know where Shields had gone. Lieutenant Reeves detailed for the jury the extent of law enforcement's efforts to find Shields over the course of the following months wherever and whenever a lead developed.

### 2. Officer Lance Richburg

Thirteen months after Lieutenant Reeves and Ranger Lain interviewed Thornburg, Officer Lance Richburg with the Sweetwater Police Department met with Thornburg's ex-girlfriend, Sarah Santiago, on January 21, 2013, to take her statement on a domestic-violence allegation involving Thornburg. Santiago had called the police the night before and had alleged that Thornburg had assaulted her. Because Santiago was seven months' pregnant with Thornburg's baby, the police

who responded to her 911 call advised her to go to the hospital and to wait until the following day to go to the police department to make a statement.

When she made her statement on January 21, 2013, Santiago said that she was scared of Thornburg because he had threatened to kill her and her unborn baby and to bury them in a field. Santiago said that Thornburg had told her that he had done it before and had gotten away with it. Based on Santiago's statement, Officer Richburg called the Graham Police Department. Lieutenant Jim Reeves of the Graham Police Department responded that Thornburg was a person of interest in an unsolved disappearance in Young County.

After talking with Lieutenant Reeves, Officer Richburg and three other officers accompanied Santiago back to the apartment that she shared with Thornburg to effectuate a "civil standby" while Santiago gathered her personal belongings. Thornburg was home when the officers arrived, and Officer Richburg explained the nature of their visit and the police department's "civil standby" policy. Thornburg voiced no objections to the police officers' presence and waited outside the apartment while Santiago gathered her belongings, accompanied by Officer Richburg. When Santiago and Officer Richburg entered the couple's bedroom, Santiago pointed to a gun on the bed and said that Thornburg had used it to threaten her. Officer Richburg testified that he took the gun into evidence for the domestic-violence charge.

### 3. Additional Testimony from Lieutenant Reeves

Lieutenant Reeves served a search warrant on the Sweetwater Police Department and obtained the gun that Officer Richburg had recovered from the

apartment that Thornburg shared with Santiago. Lieutenant Reeves later delivered the gun to Lubbock's Department of Public Safety crime lab for analysis.

In response to Santiago's claims about Thornburg's threats to her, Lieutenant Reeves and Ranger Lain approached Santiago and asked her to make a clandestine telephone call to Thornburg.

### 4. Ranger Lain

On February 1, 2013, Ranger Lain ["Lain"] and Lieutenant Reeves staged a controlled phone call between Santiago and Thornburg. During the approximately thirty-minute call, Santiago told Thornburg that she was afraid to move back in with him because she was "afraid [he] would hurt me like you hurt [Shields]." Despite telling Santiago that he did not feel comfortable talking about it over the phone, Thornburg stated, "I killed her because of me—she was going to make it so I couldn't see my daughter . . . ." Santiago asked Thornburg whether he might not kill her too if he got angry with her, and Thornburg answered, "I wouldn't get away with it for two girlfriends." A recording of the phone call was admitted into evidence and played for the jury.

Ranger Lain obtained cell phone records for Shields and Thornburg. Ranger Lain testified that the cell phone records revealed that Thornburg and Shields had exchanged text messages and phone calls from 9:32 p.m. on December 10, 2011, until 12:45 a.m. on December 11, 2011, which was Shields's last text message to Thornburg. Thornburg called Shields's phone at 2:32 a.m. and 2:33 a.m.; approximately thirty minutes later, he called Shields's phone at 3:01 a.m. for forty-five seconds and at 3:02 a.m. for fifty-eight seconds. At 6:08 a.m. on December 11,

2011, Thornburg texted Shields, "I'm at home. I've been at home. Didn't have enough gas. I['m] sorry, Babe, that it took so long to text you back, but just know I love you and will text you when I get up." The bulk of the phone calls and text messages that were reflected in the cell phone records had been deleted from Shields's cell phone.

When Ranger Lain and Officer Reeves interviewed Thornburg on December 29, 2011, he said that the last time he had spoken to Shields was 2:33 a.m. on December 11, 2011, and that he had fallen asleep right after the 2:33 a.m. phone call. Based on the phone records, Ranger Lain testified that his theory was that Shields was deceased prior to Thornburg's calls to her cell phone at 3:01 a.m. and 3:02 a.m., that Thornburg had called Shields's phone to locate it, that he had found it, that he had deleted the text messages and phone calls, and that he had returned it to her grandparents' home in Graham before he returned to Sweetwater.

### 5. Brent Hester

Brent Hester, a forensic scientist employed by DPS, testified that he had performed a presumptive test on two stains found on the underside of the gun. He said that he had obtained a presumptive positive result for blood on one spot less than one millimeter in diameter, which was almost invisible to the naked eye. From that stain, Hester said that he had obtained a DNA sample that he had compared to Shields's DNA profile from her sex-offender registration requirements, as well as to a DNA sample from a biopsy slide that was maintained in Shields's medical records following an earlier gall bladder surgery. Based on those comparisons, Hester determined that the probability of selecting an unrelated person at random

who could be the contributor to the DNA profile obtained from the stain on the gun was "approximately one in 32.39 trillion for Caucasians . . . ."

### 6. Jeff Shaffer

Jeff Shaffer, who managed the United States Secret Service digital forensics lab, testified that he had conducted an analysis of the cell phone records of Thornburg, which Ranger Lain had obtained by subpoena. Shaffer testified that he had analyzed the system identification numbers (SIDs) associated with Thornburg's cell phone carrier reflected in the records as they related to Thornburg's use of his cell phone during the evening and early morning hours of December 10, 2011, and December 11, 2011. Shaffer said that the data indicated that Thornburg's cell phone location had moved from the SID covering the Abilene/Sweetwater geographic area to the SID covering the Vernon geographic area east of Abilene/Sweetwater. Shaffer testified that he could not necessarily say that Thornburg's cell phone indicated travel from Sweetwater to Graham because he did not know the actual location of cell towers associated with the described SIDs. Shaffer said that he could say with certainty that Thornburg's cell phone had traveled generally "from one geographic area to another" west to east on the night in question.

### D. Accomplice–Witness Testimony

Lajuana Long [hereinafter, "Long"] was another of Thornburg's girlfriends with whom he had a child. In her first interview with Lieutenant Reeves and Ranger Lain shortly after Shields's disappearance in 2011, Long told the officers that she worked with Shields at the Whataburger in Graham, but Long denied having any

9

information about Shields's whereabouts. In her second interview following Thornburg's arrest in 2013, Long told law enforcement officials that she had heard that Shields had moved to Oklahoma in December 2011. After her third interview in March 2013 and after Ranger Lain told her that he thought she was lying, Long told Lain that she knew that Thornburg had murdered Shields and that she knew where her body could be found.

Long testified at trial and said that she and Thornburg had lived together in Graham until September 2011, when he had begun a relationship with Shields. After Thornburg began dating Shields, Long said that she found out that Shields was a registered sex offender and told Thornburg that she did not want their child around Shields. Long said that Thornburg began to talk about killing Shields. Long also said that Thornburg threatened to make Long "evaporate" if she tried to keep him from seeing their child.

Late in the day on December 10, 2011, Long said that Thornburg sent her a text that he was coming to Graham, where Long lived with Jessica Cortez, to see Shields. Long testified that she and Thornburg had previously discussed ways of disposing of Shields's body after watching television shows, and that on this occasion, Long asked her if she had any bleach. Late that night, Thornburg arrived at Cortez's mobile home. Long said that she took a half-full bottle of bleach and met Thornburg outside in the driveway. When she asked him whose car he was driving, Thornburg told Long that he had taken the car from his mother's home while she was sleeping. Long said that as they talked, she noticed a gun in the car. Long ultimately gave Thornburg the bleach, and he left. About an hour or two later,

Thornburg called Long and told her that he had "[done] what he came to do" and that he was headed back home. When Shields did not show up for work at Whataburger the next morning on December 11, 2011, Long said that she called Thornburg and asked him if he had really killed Shields; he told Long that he had.

Several days later, Long went to visit Thornburg in Sweetwater and asked him about Shields again. Long testified that Thornburg had told her that after he had persuaded Shields to come out of her house to talk, he had taken her to a field between Graham and Breckenridge and had shot her in the head. Thornburg said that Shields had tried to move after he had shot her, so he shot her again, covered her, and left.

Long testified that she had initially lied to investigators when she was questioned about Shields's disappearance because she had been scared of Thornburg. Long said that she had entered a plea of guilty to Shields's murder as a co-conspirator in exchange for a thirty-year prison sentence.

### E. Testimony from Other Individuals

### 1. Lychelle Doolittle

Thornburg's mother, Lychelle Doolittle, testified that Thornburg was living with her in Sweetwater when Shields disappeared. She said that around the time of Shields's disappearance, she entered her car to go to church and discovered that the car's gas tank was empty even though she had filled it with gas the day before. Doolittle said that Thornburg did not seem very concerned about Shields's disappearance. Doolittle testified that when she heard that Shields was missing, she "had thoughts" that her son might have had something to do with her disappearance.

11

Doolittle said, "[O]nce [Thornburg] quit talking to [Shields] over the phone and the gas situation and the attitude behind everything, it hit me in the face that he very well could have been a part of it, . . . ."

### 2. Steve Brown

Steve Brown ["Brown"], who was partying on the night of December 10 with Long and some of her friends in Cortez's mobile home in Graham, testified that Long had received a phone call from Thornburg late that night and that she had started out of the house. Brown asked Long what she was doing, and Long answered that she was taking some bleach to Thornburg. Brown testified that Long had grabbed a container of bleach and that he had followed her. When Brown saw that Thornburg was in the driveway, Brown went back inside. When Long came back inside, she no longer had the bleach with her.

### 3. Jessica Cortez

Jessica Cortez ["Cortez"], who owned the mobile home where Long was living in December 2011, testified that she questioned Long when she discovered that the household's bleach was gone. Cortez testified that Long had told her that she had given the bleach to Thornburg because he had killed Shields.

### 4. Timothy Thornburg

Thornburg's half-brother Timothy testified that Thornburg had come to his house about five months before Thornburg was arrested and had told Timothy what he had done to Shields. Timothy said that Thornburg had described the killing in detail, including telling him the pretense Thornburg said that he had used to lure Shields out into a field; Thornburg said that he was taking Shields to a place where

he and Timothy used to build clubhouses when they were children. Thornburg told

him that he had shot Shields in the back of the head but that she was not quite dead,

so he shot her a few more times and then poured bleach over her body. Timothy

testified that Thornburg had told him that he had killed Shields because she was a

"lying, cheatin' skank."

### F. Outcome

After hearing the above evidence, the jury convicted Thornburg of the

offense of murder as charged in the indictment and assessed his punishment at life

imprisonment.

*Id.* at *1–5.

### LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides in

pertinent part that:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal court may grant a writ of habeas corpus if the state

court either arrived at a conclusion opposite to that reached by the Supreme Court on a question

of law or decided a case differently from the Supreme Court on a set of materially indistinguishable

facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000); *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. The standard for determining whether a state court's application was unreasonable is objective. *Id.* at 409–10. The "unreasonable application" clause concerns only questions of fact. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

When ruling on a petition for a writ of habeas corpus, the Court defers to the factual findings of state trial and habeas courts. *Moody v. Quarterman*, 476 F.3d 260, 267–68 (5th Cir. 2007). The state court's determination of a factual issue is presumed to be correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 341–42 (2003). This presumption applies not only to explicit findings of fact but also to factual findings implied in explicit conclusions of law. *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) (citing *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson*, 132 F.3d 162, 183–84 (5th Cir. 1997)).

Federal habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). In the context of habeas corpus, "adjudicated on the merits" is a term of art that refers to a state court's disposition of a case on substantive rather than procedural grounds. *See Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997). Federal courts presume that a later, unexplained opinion rests on the same ground as the "last reasoned opinion" on the claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

## ANALYSIS

Thornburg challenges his conviction on twelve grounds. First, he argues that he suffered a due process violation because (1) there was insufficient evidence to convict, specifically, that the prosecution did not prove that the victim was murdered within Young County; (2) the trial court allowed the prosecution to present speculative DNA evidence; (3) the trial court allowed the prosecution to elicit extraneous offense evidence during the guilt-innocence phase of his trial; and (4) the trial court failed to include a mandatory accomplice-witness instruction in the jury charge.

Thornburg's fifth through twelfth claims all allege ineffective assistance of counsel. He alleges that his trial counsel was deficient by failing to (5) request an accomplice witness instruction; (6) conduct sufficient investigations; (7) object to the trial court's lack of subject-matter jurisdiction; (8) request a directed verdict at closing; (9) remove two witnesses for bias; (10) object to testimony from a witness who testified to Thornburg's guilt; and (11) object to victim-impact testimony. For claim (12), he alleges that his appellate counsel failed to raise the issue of insufficient evidence on the basis that the prosecution did not prove that the victim was murdered within Young County.

The Director disputes all of these claims and argues that Thornburg has not sufficiently exhausted his state court remedies with regard to certain claims.

## I.     Thornburg's first claim for sufficiency of the evidence is barred because he did not raise it on direct appeal.

Normally, a petitioner must fully exhaust state remedies before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A); *Nobles v. Johnson*, 127 F.3d 409, 419 (5th Cir. 1997). To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his federal claim to the state courts. *Picard v. Connor*, 404 U.S. 270, 275–76 (1971) ("The [exhaustion] rule would serve no purpose if it could be satisfied by raising one claim in the state

15

courts and another in the federal courts."). The exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6–7 (1982); *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983). Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1999)). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Exhaustion is not required if there is an absence of available state corrective process or if circumstances exist that render such process ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1)(B). The exhaustion requirement "is not jurisdictional, but reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009) (internal quotation marks and ellipses omitted). In Texas, a prisoner must present his claims to the TCCA in a PDR or an application for writ of habeas corpus in order for those claims not to be barred by the exhaustion requirement. *Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986); *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985).

Thornburg filed a direct appeal to the state COA, a PDR to the TCCA, and a state habeas

petition to the TCCA. ECF No. 3 at 3–4; No. 18 at 2–3. As a result, he has exhausted his state remedies as to any claim presented in those state actions. In the first claim in his federal habeas petition, Thornburg argues that there was insufficient evidence to convict him because the prosecution did not prove the essential element of venue, that is, that the crime occurred in Young County. ECF No. 3 at 9–15. The Director argues that Thornburg did not exhaust his sufficiency of the evidence claim because he did not raise it on direct appeal or in his state habeas petition. ECF No. 18 at 14. Thornburg concedes that he did not raise the issue of venue on direct appeal, but he nevertheless argues that this Court should consider the claim because of his "appellate attorney's failure." ECF No. 3 at 19. Both parties acknowledge that, under Texas law, Thornburg could not have raised sufficiency of the evidence for the first time on state collateral review in an application for writ of habeas corpus. *Id.*; ECF No. 18 at 14; *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994); *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004).

Thornburg never raised this claim in any state-level proceeding. He gives no reason for his failure except to blame his appellate attorney, an alleged failure which the undersigned will consider later in his final ineffective assistance of counsel claim. It is clear that Thornburg failed to exhaust his state remedies because he presents new legal theories in his federal habeas petition. *Anderson*, 459 U.S. at 6–7; *Vela*, 708 F.2d at 958. Nor can Thornburg return to the state courts to assert this claim, because he cannot raise a sufficiency of the evidence claim in a state habeas petition. *Renz*, 28 F.3d at 432; *Grigsby*, 137 S.W.3d at 674. The claim is unexhausted and procedurally barred, and federal habeas review is therefore unavailable. *See Coleman*, 501 U.S. at 750.

## II.     Thornburg was not denied the right to due process because the trial court allowed expert evidence of the victim's blood being found on his handgun.

A fundamentally unfair trial violates the Fourteenth Amendment right to due process. *Cupit*

*v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994). A trial is deemed "unfair" when it has been "largely robbed of dignity due a rational process." *Johnson v. Blackburn*, 778 F.2d 1044, 1050 (5th Cir. 1985) (citation omitted).

Evidentiary rulings made during a state trial are matters of state law that are not subject to re-examination by the federal courts. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding that it is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). In habeas actions, federal courts "do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Jackson v. Johnson*, 194 F.3d 641, 656 (5th Cir. 1999); *see also Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997) ("[A] federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair."). "[T]he erroneous admission of prejudicial testimony does not justify habeas relief unless the evidence played a 'crucial, critical, and highly significant' role in the jury's determination." *Jackson*, 194 F.3d at 656 (quoting *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998)).

In his direct appeal, Thornburg argued that the trial court erred in admitting expert testimony as to whether the expert located the victim's blood on Thornburg's gun. ECF No. 51 at 46. Thornburg argued that the expert's testimony was not reliable under Texas Rule of Evidence 702 and that therefore the trial court should have excluded the testimony. *Id.* at 47. The COA engaged in a harmless error analysis, without deciding whether the trial court had erred in admitting the testimony. *Thornburg*, No. 02-14-00453-CR, 2015 WL 4694094, at *9. The COA

found the record showed "overwhelming evidence of Thornburg's guilt" aside from the DNA evidence, including Thornburg's extrajudicial confessions as well as the recording of a call during which he stated that he killed Shields. *Id.* The COA also noted that the jury charge did not specifically mention the gun, and the prosecution mentioned but did not emphasize the DNA evidence during its closing argument. *Id.* The COA therefore concluded that the admission of the DNA evidence was harmless "in the context of the entire case against Thornburg . . . ." *Id.* Because the TCCA denied the PDR without written order, the undersigned presumes that the TCCA followed the opinion of the COA, as it issued the "last reasoned opinion" on the matter. *See Ylst*, 501 U.S. at 803.

Thornburg argues that the COA erred by considering the admission of the DNA evidence to be harmless. ECF No. 3 at 26–29. He argues that the evidence the COA considered to be evidence of guilt was weak: Shields's disappearance, her failure to call her mother, the erasure of Shields's cell phone records, and Thornburg's cell phone records indicating his movements the night of Shields's death. *Id.* Thornburg contends that, compared with such supposedly weak evidence, the DNA evidence "was the linchpin of this conviction . . . save the extrajudicial statements which were allegedly made by the petitioner." *Id.* at 28–29.

Notably, Thornburg failed to make any argument in his federal habeas petition that the trial court incorrectly admitted the DNA evidence, instead disputing only the findings of the COA. *See id.* The Director argues that Thornburg thus waived this issue due to inadequate briefing. ECF No. 18 at 17 (citing *Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999)). To the contrary, Thornburg extensively briefed this issue with four pages of argument citing law and facts from the record, and as such he did not waive the issue. ECF No. 3 at 26–29. Because he did not make any argument on the trial court's error, however, the undersigned cannot conclude that the trial court

made any error, and thus Thornburg has failed to show a violation of the Fourteenth Amendment at his trial that would entitle him to habeas relief.

Even assuming the trial court erred in admitting the DNA evidence, Thornburg's argument leaves out significant inculpating evidence found in the record and noted by the COA. The omitted evidence includes:

- around the time of Shields's disappearance, Thornburg's mother, with whom he lived, noticed that her car's gas tank was empty despite having filled it the day prior;
- the month before Shields's disappearance, Thornburg and Long had discussed killing Shields;
- Brown saw Long give Thornburg a bottle of bleach late on the night of December 10, 2011;
- when Cortez noticed that the bleach she shared with Long was gone, she questioned Long, and Long said that she had given the bleach to Thornburg because he had killed Shields;

*Thornburg*, No. 02-14-00453-CR, 2015 WL 4694094, at *7. This evidence—while circumstantial—could have indicated to the jury that Thornburg drove his mother's car a significant distance with a bottle of bleach to eliminate evidence that he killed Shields. Additionally, though Thornburg suggests that the Court should ignore his multiple extrajudicial confessions when making this analysis, he has made no argument that those confessions were not properly admitted and before the jury. *See* ECF No. 3 at 28. As the COA noted, these confessions are the single most probative evidence of Thornburg's guilt. *Thornburg*, No. 02-14-00453-CR, 2015 WL 4694094, at *9. The standard before this Court is that erroneous admission of prejudicial testimony only justifies habeas relief if the evidence played a "crucial, critical, and highly significant" role in the jury's determination. *Jackson*, 194 F.3d at 656. In the face of, to use the COA's phrasing, "overwhelming evidence of Thornburg's guilt," even an erroneous admission of DNA evidence would not justify habeas relief on this ground.

Thornburg additionally makes the argument that the COA did not show that the state

satisfied the "corpus delicti" rule. ECF No. 3 at 26. The "corpus delicti" rule is a state-law rule "of evidentiary sufficiency affecting cases in which there is an extrajudicial confession." *Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015) (citing *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013)). The rule states that a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence that the "essential nature" of the crime was committed by someone. *Id.* But the "corpus delicti" rule is a state rule, not a constitutional mandate. *See West v. Johnson*, 92 F.3d 1385, 1393 (5th Cir. 1996); *Autry v. Estelle*, 706 F.2d 1394, 1407 (5th Cir. 1983) ("Such a state rule of 'corpus delecti' has no independent constitutional footing."). On federal habeas review, a federal court decides only whether constitutional standards were met, even if state law would impose a more demanding standard of proof. *West*, 92 F.3d at 1393 (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)). The standard before this court, when deciding whether the admission of allegedly inadmissible evidence requires habeas relief, is whether the error resulted in the denial of a constitutionally fair proceeding. *See Jackson*, 194 F.3d 641, 656. And, as just analyzed, the asserted error did not, considering the amount of evidence arrayed against Thornburg. Habeas relief is not warranted on this ground.

### III. Thornburg's third and fourth record-based claims are barred because he did not raise them in his direct appeal.

Normally, a petitioner must fully exhaust state remedies before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A); *Nobles v. Johnson*, 127 F.3d 409, 419 (5th Cir. 1997). If the last state court to consider the claims expressly based its denial of relief on independent and adequate state procedural grounds, the petitioner's claims are considered to have been defaulted, and federal habeas review is barred unless the petitioner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law or shows that failure to consider the

claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

The TCCA has held it will not consider in habeas proceedings any record-based claims that the petitioner did not raise on direct appeal. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996), *clarified on reh'g* (Feb. 4, 1998). The Fifth Circuit has held that the *Gardner* rule sets forth an adequate state ground capable of barring federal habeas review. *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (citing *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004)).

Thornburg raises two record-based claims that are procedurally barred because he first raised them on state habeas review. First, he argues that the trial court erred by allowing a witness to testify to extraneous offense evidence. ECF No. 3 at 29–32. The trial court overruled Thornburg's objection, finding the testimony was probative, and allowed Thornburg's ex-girlfriend to testify that Thornburg headbutted her and pulled her hair while she was pregnant, then pointed to a gun and said he would shoot her the same way he shot Shields. ECF No. 20-9 at 173–79. Second, Thornburg argues that the trial court erred by failing to include an accomplice-witness instruction in the jury charge because Thornburg's co-defendant, Lajuana Long, testified at his trial. ECF No. 3 at 32–34.

Thornburg did not present these arguments in his direct appeal. *See* ECF No. 20-51. Thornburg first presented these arguments in his state habeas petition. ECF No. 20-61 at 16. The state habeas court ruled, under the *Gardner* rule, that it would not consider these claims. ECF No. 20-60 at 272–75. The TCCA denied Thornburg's writ of habeas corpus without written order on the findings of the trial court. ECF No. 20-55.

Thornburg has presented no argument for his failure to raise these claims on direct appeal, nor any argument that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Because the state court rejected these claims under the *Gardner*

rule, there is a procedural bar to this Court considering these claims on federal habeas review. *Dorsey*, 494 F.3d at 532.

## V.    Habeas relief is not warranted on Thornburg's ineffective assistance of counsel claims.

The Sixth Amendment of the United States Constitution guarantees a criminal defendant "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* established a two-prong test for proving ineffective assistance of counsel: (1) petitioner's counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner. *Id.*

To satisfy the first prong of *Strickland*, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. A court's review of counsel's performance must be "highly deferential" and must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752–53 (5th Cir. 2003) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)). "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not simply to give [the] attorneys the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d

23

410, 421 (5th Cir. 2012) (internal quotation marks omitted).

To prove prejudice under the second prong, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Moreover, a reasonable probability "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Harrington*, 562 U.S. at 110).

Where, as in most of the claims in the instant case, the state court adjudicated ineffective-assistance claims on the merits, this Court must review Petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen*, 563 U.S. at 190 (citing *Knowles v. Mirzayance*, 556 U.S. 111 (2009)); *see also Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010) ("Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1)."). The question in such cases is not only whether counsel's performance fell below the *Strickland* standard, but also whether the state court made an unreasonable application of federal law under § 2254(d)(1). *Harrington*, 562 U.S. at 101. In these cases, both counsel and the state court are afforded the benefit of the doubt. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Burt v. Titlow*, 571 U.S. 12, 134 S. Ct. 10, 13 (2013)).

### a. Thornburg's trial counsel did not provide ineffective assistance by not requesting an accomplice-witness instruction.

Under Article 38.14 of the Texas Code of Criminal Procedure, a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." The accomplice-witness rule is an artifact of state law and is "not mandated by common law [or] the federal constitution." *Evans v. Stephens*, No. 4:13-cv-301-A,

2015 WL 66524, at *13 (N.D. Tex. Jan. 5, 2015) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)). "Thus, a determination by a state court that a defendant is not entitled to relief for the omission of a jury instruction on the accomplice-witness rule precludes federal relief on this issue." *Id.* (quoting *Schaetzle v. Cockrell*, 343 F.3d 440, 449 (5th Cir. 2003) ("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law, and we defer to the state courts' interpretation of the Texas . . . statute.")).

Thornburg's first argument that he received ineffective assistance of counsel is that his trial counsel failed to request an accomplice-witness instruction in the jury charge. ECF No. 3 at 36–40. Thornburg's argument specifically concerns the testimony of his accomplice Long. She testified that, the night after Shields's disappearance, Thornburg told her he killed Shields, and later gave her additional details concerning the murder, including the location and means. *See supra* pp. 9–11. Long additionally testified that she took bleach from the home she shared with Jessica Cortez and, while giving it to him on the night of the murder, saw a gun in the front seat of the car he was driving, which was his mother's car. *Id.*

The state habeas court reviewed the affidavit of Thornburg's trial counsel, who wrote that the defense's trial strategy was that no killing of the alleged victim had occurred and thus Thornburg could not be guilty of murder. ECF No. 20-60 at 264. Thornburg's counsel did not request an accomplice-witness instruction because it would have undercut the defense's theory that no crime had occurred and, presumably, there could not therefore be any accomplice. *Id.* at 264. The state habeas court concluded, on the basis of this affidavit and the applicable state law, that there was a "plausible basis in strategy or tactics for trial counsel's actions" and thus that Thornburg's trial counsel was not deficient. *Id.* The TCCA adopted these findings as its own when denying Thornburg's writ of habeas corpus. ECF No. 20-55.

25

The state court here found that Thornburg's counsel was not deficient because he did not request the instruction as part of a plausible trial strategy. ECF No. 20-60 at 265; *see also* ECF No. 20-59 at 3–4 (counsel's affidavit). Out of deference to the state court's conclusion, this Court cannot grant habeas relief on this ground. *See Schaetzle*, 343 F.3d at 449.

Even aside from the required deference to state-court interpretation of state law, Thornburg has not shown deficient performance or prejudice. Thornburg's counsel explained that he made a conscious and informed decision as part of his trial strategy, and such a decision is not deficient performance. *See Cotton*, 343 F.3d at 752–53. Indeed, Thornburg himself utilizes this strategy—that there was no crime committed—in an earlier part of his federal habeas petition. *See* ECF No. 3 at 26–28. There was no deficient performance under the *Strickland* standard.

Additionally, even if Thornburg's counsel were deficient for not requesting an accomplice-witness instruction, Thornburg has not shown prejudice. The accomplice-witness rule is that the testimony of an accomplice must be "corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Crim. Proc. Code Art. 38.14. Thus, for Thornburg to show that he was harmed by the omission of an accomplice-witness instruction, he would have to show a reasonable probability the jury would have rejected Long's testimony as uncorroborated. Thornburg makes no argument that Long's testimony was uncorroborated, and a review of the evidence shows significant corroboration, including: the timing of Shields's disappearance, the testimony of Brown and Cortez that Long took the bleach and gave it to Thornburg, the DNA on Thornburg's gun, the testimony of Thornburg's half-brother that Thornburg described killing Shields in detail, and the recording of Thornburg himself admitting that he killed Shields. *Thornburg*, No. 02-14-00453-CR, 2015 WL 4694094, at *1–5, 7. Thornburg's argument is that

Long's testimony was "the most prejudicial of all" to his conviction for murder. ECF No. 3 at 38. But that appellation better fits Thornburg's own recorded admission that he murdered Shields. Thornburg has not shown that he was prejudiced by his trial counsel's alleged error.

In sum, this Court defers to the conclusion of the state court that the state-created accomplice-witness rule does not provide habeas relief for Thornburg. Even if deference were not required, the undersigned concludes that it was not ineffective assistance of counsel for Thornburg's trial counsel not to make a request for an accomplice-witness jury instruction.

### b. Thornburg's trial counsel did not provide ineffective assistance by not conducting an independent investigation of the prosecution's witnesses.

Habeas relief can be warranted on the ground of ineffective assistance of counsel where an attorney does not engage in a reasonable amount of pretrial investigation, which at a minimum requires counsel to interview potential witnesses and make an independent investigation of the facts and circumstances in the case. *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (citing *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985)); *see also Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003). A strong indication that counsel performed unreasonably is if counsel did not interview eyewitnesses and alibi witnesses. *Bryant*, 28 F.3d at 1415. Counsel provides ineffective assistance where he relies solely on discussions with the defendant and material provided by the prosecution. *Anderson*, 338 F.3d at 391.

"In assessing unreasonableness a heavy measure of deference must be applied to counsel's judgments. A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (citations omitted). "Under *Strickland*, however, a petitioner cannot "simply allege but must 'affirmatively prove' prejudice." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) (quoting *Celestine v.*

27

*Blackburn*, 750 F.2d 353, 356 (5th Cir. 1984)).

Thornburg cites *Bryant* and *Anderson* and states that "[i]n this case, counsel rendered ineffective assistance of counsel due to a failure to interview witnesses and properly prepare for trial." ECF No. 3 at 42. But Thornburg does not mention, let alone prove, a single example of a witness that his counsel failed to interview or any explanation of how his counsel did not properly prepare for trial. *See id.* at 40–43. Nor does he affirmatively prove prejudice, as he makes no statement of what harm any alleged failure to investigate might have caused. The state habeas court concluded that there was no failure to conduct an independent investigation, based on Thornburg's trial counsel's affidavit that he interviewed "all the witnesses that his client designated as persons with knowledge of relevant facts" and spent 168.25 hours on preparation and trial. ECF No. 20-60 at 255–56; *see also* ECF No. 20-59 at 3–4 (counsel's affidavit). Given the "doubly deferential" standards with respect to counsel under *Strickland* and the state court under § 2254(d), Thornburg's unsubstantiated and unspecific allegations of failure to investigate do not warrant habeas relief. *See Cullen*, 563 U.S. at 190.

### c. Thornburg's trial counsel did not provide ineffective assistance by failing to object to the trial court's alleged lack of jurisdiction or by failing to request a directed verdict for lack of jurisdiction.

Thornburg argues that the trial court did not have subject-matter jurisdiction over his case because the court did not have proper venue over the case without a *prima facie* showing that the crime was committed in Young County. ECF No. 3 at 44–46. He similarly argues that his counsel was ineffective because he did not request a directed verdict based on a lack of subject-matter jurisdiction due to lack of venue. *Id.* at 47–48. These claims fail for the same reasons.

Thornburg asserts that a Texas court must have proper venue in order to try a criminal case, citing *Ex parte Moss*, 446 S.W.3d 786, 793 (Tex. Crim. App. 2014) and *Ex parte Armstrong*, 110

Tex. Crim. 362, 364, 8 S.W.2d 674, 674–675 (Tex. Crim. App. 1928). ECF No. 3 at 44. But these cases do not stand for that proposition. Both cases are habeas corpus proceedings concerning jurisdiction, but the term "venue" does not appear in either case. *Moss* concerned whether a trial court lacked jurisdiction to revoke deferred adjudication community supervision after the period of supervision expired. 446 S.W.3d at 788. *Armstrong* concerned whether a trial court could order disposition of allegedly stolen property when the state did not have jurisdiction over the only criminal charge pending against the accused fugitive who had allegedly stolen the property. *Armstrong*, 110 Tex. Crim. at 364, 8 S.W.2d at 675. As Thornburg himself states in his petition, venue and jurisdiction are different, so these cases do not apply. *See* ECF No. 3 at 44.

The Director correctly notes that, in Texas, venue is not a jurisdictional issue. *Garner v. Scott*, 59 F.3d 1242 (5th Cir. June 21, 1995). The citation for this holding is worth citing in full:

> *See, e.g., Boyle v. State*, 820 S.W.2d 122, 139 (Tex. Crim. App. 1989) ("[T]he fact [that] a particular district court in this State does not have venue is irrelevant as to whether that court has jurisdiction."); *Fairfield v. State*, 610 S.W.2d 771, 779 (Tex. Crim. App. 1981) ("Nor does 'venue,' proper or not, affect the *power* of a district court to hear and determine a felony case; 'jurisdiction' is comprised not of the 'place' of the prosecution, but of the power of the court over the 'subject matter' of the case . . . . Concomitantly, improper venue may be waived by the defendant's failure to raise it as an issue in the trial court . . . ." (citations omitted)); *Etchieson v. State*, 574 S.W.2d 753, 759 (Tex. Crim. App. 1978) ("There is a distinct difference between jurisdiction and venue. Jurisdiction concerns the authority or power of a court to try a case. Practically all, if not all, district courts have the authority to try felony cases. Venue has to do with the place or county where a case may be tried.").

*Id.* Indeed, under Article 4.01(3) of the Texas Code of Criminal Procedure, district courts have jurisdiction in criminal actions. Any objection Thornburg's trial counsel would have made to the *jurisdiction* of the district court to try the case, based on whether *venue* was proper in that court, would have been futile. Habeas relief for ineffective assistance of counsel cannot be had based on counsel's failure to make a futile objection. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002); *Rios-Delgado v. United States*, 117 F. Supp. 2d 581, 589 (W.D. Tex. 2000).

In addition, Thornburg's counsel stated in his affidavit filed in the state habeas court case that he did not believe that making an objection to jurisdiction or requesting a directed verdict on lack of jurisdiction was consistent with the defense's trial strategy that there was no murder. ECF No. 20-59 at 3. The state habeas court found the affidavit credible, and it further concluded that the trial court had jurisdiction over the case. ECF No. 20-60 at 253–55, 269–71. Again, given the "doubly deferential" standards with respect to counsel under *Strickland* and the state court under § 2254(d), Thornburg's claim that counsel failed to make a futile objection or a futile request for a directed verdict does not warrant habeas relief. *See Cullen*, 563 U.S. at 190.

### d. Thornburg's trial counsel did not provide ineffective assistance by failing to remove two jurors.

The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." *Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir. 2006). "Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "The relevant question is whether the jurors at [the] trial had such fixed opinions that they could not judge impartially respondent's guilt." *Patton v. Yount*, 467 U.S. 1025, 1026 (1984). A claim that counsel failed to remove jurors with actual bias can be a basis for habeas relief. *See Hughes v. United States*, 258 F.3d 453, 460 (6th Cir. 2001) (finding a juror was actually biased because she stated that she could not be fair based on her personal relationships with police, as a law enforcement official was the victim in the case); *Virgil*, 446 F.3d at 613–14 (analyzed in detail in the following paragraph). But not every indication of bias requires a court to find that a juror was actually biased. *See Patton*, 467 U.S. 1025, 1029–30 (holding that the trial court did not commit "manifest error" when finding jury members to be impartial, though eight of the fourteen jurors had admitted they had formed an opinion of the

30

defendant's guilt based on pretrial publicity); *Torres v. Thaler*, 395 Fed. App'x 101, 107–08 (5th Cir. 2010) (denying habeas relief because the challenged juror had not "unequivocally expressed he could not be fair and impartial"). In addition, counsel does not provide ineffective assistance even by electing to seat an actually biased juror if he can show that he made a reasonable tactical decision in doing so. *Morales v. Thaler*, 714 F.3d 295, 306 (5th Cir. 2013).

In *Virgil*, the Fifth Circuit considered two groups of allegedly partial jurors that defense counsel did not strike. *Id.* at 608. The first group consisted of three jurors who "testified, with merely a single 'no' answer, that they could not fairly consider the testimony of a person with a prior conviction." *Id.* The Fifth Circuit found that this response was "a limited and natural response . . . insufficient to raise any obligation on the part of counsel to respond with a peremptory or for-cause challenge." *Id.* at 609. The Fifth Circuit concluded that counsel did not provide ineffective assistance by not striking this first group, quoting the Supreme Court's decision in *Irvin v. Dowd*:

> To hold that the mere existence of any preconceived notion as to guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* (quoting 366 U.S. 717, 723 (1961)). The Fifth Circuit did find that counsel was ineffective for not challenging the second group, which consisted of two jurors who expressly stated that they could not be "fair and impartial" because of personal experiences or attachments. *Id.* The court also found that defense counsel's "conclusory affidavit" was lacking because it did not indicate why counsel did not challenge these two jurors for cause, even though he used all peremptory strikes, and because counsel did not indicate why he believed these two jurors' answers did not indicate prejudice or bias against the accused. *Id.* at 610. As a result, the Fifth Circuit held that the state court unreasonably applied the law, that prejudice existed, and that habeas relief was

31

warranted. *Id.* at 611–14.

Thornburg contends that his trial counsel provided ineffective assistance by failing to remove two jurors who stated they "slightly agreed" with his counsel's hypothetical statement during *voir dire* that "[i]f the police charge a person with a crime, that person is probably guilty." ECF No. 3 at 49–50, No. 20-60 at 260. Of the two jurors, only one was rehabilitated and repeatedly affirmed his ability to be fair to the accused. ECF No. 20-8 at 191–94; No. 20-60 at 260–63. The other, a Ms. Damron, was not rehabilitated, as Respondent essentially concedes. ECF No. 18 at 33. The only time in the *voir dire* record that Ms. Damron speaks is during the response at issue:

> [DEFENSE COUNSEL]: And, Ms. Damron, you haven't said anything at all. What do you think?
> VENIREPERSON: I'd go three.
> [DEFENSE COUNSEL]: Three, which is slightly agree?
> VENIREPERSON: Yes.

ECF No. 20-8 at 118.

Thornburg's counsel's affidavit states that he was unable to eliminate all unacceptable jurors because he used all his peremptory strikes and that, in any case, they were "equivocal in their belief about innocence of an accused citizen" and both were rehabilitated. Like the affidavit in *Virgil*, this affidavit is for the most part conclusory and provides no reason why counsel did not attempt a strike for cause. *See* 446 F.3d at 610. More importantly, the affidavit is actually incorrect, because Ms. Damron was not rehabilitated after her statement. Respondent argues for deference to the state habeas court's implicit finding that the affidavit was credible. ECF No. 18 at 34. But the state habeas court did not base its conclusion on counsel's affidavit. *See* ECF No. 20-60 at 263–64. And this Court would not in any case defer to a state-court decision based on an erroneous and conclusory affidavit, as illustrated by *Virgil*. *See* 446 F.3d at 610.

The state habeas court explicitly decided that habeas relief was not warranted based on its

conclusion that the two challenged jurors were not "actually biased," which is the constitutional standard. ECF No. 20-60 at 263–64. Therefore the question before this Court is whether, under § 2254, the state habeas court unreasonably applied the law in concluding that the two challenged jurors were not actually biased. The court found, reasonably, that the trial court rehabilitated the first challenged juror. *Id.* at 263. The state habeas court next concluded that Ms. Damron was not actually biased against Thornburg because she "never unequivocally stated a conclusion as to [Thornburg's] guilt or innocence [but] only agreed to answer a hypothetical question . . . ." *Id.* at 263–64.

The central question, then, is whether Ms. Damron more resembles the *Virgil* jurors who did not indicate actual bias by making "a limited and natural response . . . insufficient to raise any obligation on the part of counsel to respond with a peremptory or for-cause challenge" or the jurors who evidenced actual bias by expressly stating that they could not be "fair and impartial" because of personal experiences or attachments. 446 F.3d at 609–10. Ms. Damron better fits with the first category. Her only statement in all of the *voir dire* is that she slightly agrees with the general statement that a person charged with a crime is probably guilty, which is a limited and natural response to the question. Nothing else in the record or in Thornburg's argument provides support for finding that Ms. Damron was actually biased against Thornburg. Ms. Damron's slight agreement with this general question showed only that she had a slight preconceived notion as to the guilt of a hypothetical accused person, and to hold that such slight agreement to a general question indicates actual bias would be to establish an impossible standard for juror qualification. *See Irvin*, 366 U.S. at 723.

In addition, a federal court can only grant habeas relief if the state court *unreasonably* applied the law. *See* 28 U.S.C. § 2254(d). An unreasonable application is different from an

erroneous or incorrect application. *Williams*, 529 U.S. at 365, 411–12. The evidence for Ms. Damron's alleged bias is so slight, compared with the biases found sufficient in the relevant case law, that the state habeas court's conclusion would not be unreasonable even if the undersigned found it to be in error. Habeas relief is not warranted on this ground.

### e. Thornburg's trial counsel did not provide ineffective assistance by not objecting to a witness's opinion as to Thornburg's guilt.

Rule 701 limits lay-witness testimony in the form of an opinion "to one that is: (a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." Expert witnesses may testify in the form of an opinion, with the only limitation being if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. "An opinion is not objectionable just because it embraces an ultimate issue." Tex. R. Evid. 704; *Ex parte Nailor*, 149 S.W.3d 125, 134 n.39 (Tex. Crim. App. 2004). A police officer may testify as a lay witness or an expert witness, according to his experience and training, that he interpreted a defendant's actions as a criminal action. *Williams v. State*, 826 S.W.2d 783, 785 (Tex. App.— Houston [14th Dist.] 1992, pet. ref'd) (holding that a police officer could testify that he recognized the defendant's actions as a drug transaction).

Thornburg argues, in his tenth point of error, that his trial attorney was ineffective by not objecting to the testimony of Ranger Cory Lain ("Lain"). ECF No. 3 at 51–54. The testimony in dispute is as follows:

> [Prosecutor]. And you've gone through all these records. Based on all of your investigation of this case, what sort of theory have you come up with in connection with all of these phone calls and the evidence that you gathered and evaluated thus far?
>
> [Lain]. My theory on how the event took place that night?

[Prosecutor]. Yes.

[Lain]. My theory was that it coincided and was corroborated by witness testimony, along with the phone records, that Jeremy Thornburg and Lajuana Long were in direct contact earlier in the evening, somewhere around 9:30 or 10 p.m.; discussed the murder of Candice Shields. Jeremy Thornburg left Sweetwater; drove to Graham, Texas, where he picked up Candice Shields—met with Lajuana Long; picked up Candice Shields; drove her an unknown distance south of Graham, between Graham and Breckenridge; walked her out into a field; shot her and killed her. And my belief is he was looking for her phone on her body out in the middle of the dark. He was thinking evidence, so he called her phone at approximately 3:01 and 3:02 a.m.

ECF No. 20-12 at 166.

The state habeas court reviewed this excerpt. ECF No. 20-60 at 258. The court also reviewed an excerpt from the trial records in which Lain gave his qualifications, which included his position as a lieutenant in the Texas Rangers, a fourteen- or fifteen-year career as a peace officer, his training, and his duties, which included assisting local or rural agencies in five counties with investigating major crimes. *Id.* at 256–28 (referencing ECF No. 20-10 at 75–77). The state habeas court found that Lain was qualified to testify as an expert. *Id.* at 259. As a result, based on the Texas Rules of Evidence, the court found that any objection Thornburg's counsel would have made to Lain's testimony would have been futile. *Id.* The court therefore concluded that Thornburg's counsel was not ineffective in failing to object to the subject testimony. *Id.* The TCCA adopted these findings as its own when denying Thornburg's writ of habeas corpus. ECF No. 20-55.

As previously stated, a federal court will not entertain a review of a state's interpretation of its own rules, like the Texas Rules of Evidence. *See Schaetzle*, 343 F.3d at 449. The state court here found that Thornburg's counsel was not ineffective because the Texas Rules of Evidence render any such objection futile. ECF No. 20-60 at 259. Out of deference to the state court's conclusion, this Court cannot grant habeas relief on this ground.

Even aside from the required deference to state conclusions on state law, Thornburg has not shown prejudice from Lain's testimony. He states conclusorily that "Ranger Lain's testimony alone could have easily tipped the scale in this case considering the 'unique' circumstances" without explaining what those circumstances are. *See* ECF No. 3 at 54. The standard for erroneous admission of prejudicial testimony is that it only justifies habeas relief if the evidence played a "crucial, critical, and highly significant" role in the jury's determination. *Jackson*, 194 F.3d at 656. Thornburg does not show how Lain's testimony as to his guilt was "crucial, critical, and highly significant" given that Thornburg himself confessed his guilt repeatedly, including in a recording—played before the jury—in which he stated that he committed the murder. *Thornburg*, No. 02-14-00453-CR, 2015 WL 4694094, at *9. Lain's testimony in this respect was only duplicative of, and certainly less significant than, Thornburg's own recorded confession. Even putting aside the deference this Court owes to the state habeas court's opinion, Thornburg has not shown prejudice. For these reasons, habeas relief is not warranted on this ground.

### f.  Thornburg's trial counsel did not provide ineffective assistance by not objecting to victim impact testimony.

During the punishment phase of a criminal trial, "[b]oth victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." *Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998); *see also Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005) ("Victim-impact evidence or testimony generally may be admissible at the punishment phase when that evidence has some bearing on the defendant's personal responsibility and moral culpability.") *Mosley* abrogated prior Texas case law that held that victim-impact evidence was largely inadmissible at the punishment phase of trial. *Williams v. State*, 176 S.W.3d 476, 482 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

Thornburg's eleventh point of error is that his attorney provided ineffective assistance by not objecting to testimony from the victim's family at the punishment phase that was in fact victim-impact evidence inadmissible at that stage. Thornburg argues that this testimony was inadmissible based on Texas Code of Criminal Procedure Art. 42.03, which permits victim-impact evidence only after punishment has been assessed, the court has announced the terms and conditions of the sentence, and sentence has been pronounced. Thornburg asserts that the legislature enacted Article 42.03 "in order to avoid a victim impact statement from affecting the jurors [sic] impartiality." ECF No. 3 at 56. For this proposition he cites *Garcia v. State*, 116 S.W.3d 401, but the undersigned was unable to find a case with the given citation or a case with a similar name and holding. *See State v. DeAngelis*, 116 S.W.3d 396, 401 (Tex. App.—El Paso 2003, no pet.) (concerning suppression of allegedly privileged statements in a perjury trial).

Under *Mosley* and *Haley*, it is clear that this testimony is admissible. Any objection Thornburg's trial counsel would have made to testimony of Thornburg's victim's family would have been futile. Habeas relief for ineffective assistance of counsel cannot be had based on counsel's failure to make a futile objection. *Johnson*, 306 F.3d at 255; *Rios-Delgado*, 117 F. Supp. 2d at 589. In addition, this Court defers to a state's interpretation of its own rules, here, the Texas Code of Criminal Procedure. *See Schaetzle*, 343 F.3d at 449. The state habeas court concluded that the family's testimony was admissible, and this Court defers to that conclusion. ECF No. 20-60 at 268. Therefore habeas relief is not warranted on these grounds.

### g.  Thornburg's argument that his appellate counsel provided ineffective assistance is barred because it is unexhausted.

Thornburg argues that his appellate counsel provided ineffective assistance by not raising a sufficiency of the evidence claim on direct appeal. ECF No. 3 at 57–58. But Thornburg did not raise this claim in his state habeas petition or any other state-level proceeding. *See* ECF No. 20-61

at 27–84. He has presented no argument for his failure to raise these claims at the state level, nor any argument that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. As such, this claim is unexhausted and procedurally barred, and federal habeas review is therefore unavailable on this ground. *See id.*

## CONCLUSION

Thornburg has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented. The state court's findings of fact and credibility determinations are entitled to a presumption of correctness, and Thornburg has failed to rebut this presumption.

Because Thornburg has not shown that he is entitled to habeas relief, the undersigned **RECOMMENDS** that Judge O'Connor **DENY** the Petition for Writ of Habeas Corpus (ECF No. 3).

A copy of this Findings, Conclusions, and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Findings, Conclusions, and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district

court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

      Signed April 17, 2018.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE